1

2

3

4

5

6                 UNITED STATES DISTRICT COURT

7                EASTERN DISTRICT OF CALIFORNIA

8                      ----oo0oo----

9

10   BRUCE KNIESPECK,
                                CIV. NO. S-01-0878 WBS PAN
11            Plaintiff,

12      v.                      FINDINGS OF FACT, CONCLUSIONS
                                OF LAW, AND ORDER
13   UNUM LIFE INSURANCE COMPANY OF
     AMERICA, et al.,
14
              Defendants.
15
                       ----oo0oo----
16

17        Plaintiff Bruce Kniespeck brings this action under the

18   Employee Retirement Income Security Act ("ERISA") to recover

19   benefits under an employee benefits plan.  See 29 U.S.C. §

20   1132(a)(1)(B).  More specifically, plaintiff contends that he

21   was wrongfully denied benefits on a group long-term disability

22   policy issued by defendant UNUM Life Insurance Company of

23   America ("UNUM").

24        By stipulation, the trial of this case was bifurcated

25   into two phases, the second phase being a calculation of

26   benefits due.  On December 18, 2006, trial on the second phase

27   was held by this court, sitting without a jury, on the

28   administrative record according to the procedure set forth in

     Kearney v. Standard Ins. Co., 175 F.3d 1084 (9th Cir. 1999) (en

banc), <u>cert denied</u>, 528 U.S. 964 (1999).  This court, having
read and considered the documentary evidence and the written
submissions of the parties, now makes the following Findings of
Fact and Conclusions of Law pursuant to Rule 52 of the Federal
Rules of Civil Procedure.

FINDINGS OF FACT[1]

1.   Plaintiff Kniespeck was employed as a Master
Scheduler/Planner for Nevada Western Supply, Inc. ("Nevada
Western").  (UACL 00429.)

2.   At all relevant times, plaintiff was insured
under a group long-term disability insurance policy ("the
Policy") issued by defendant UNUM to Nevada Western.  (UACL
01866 - 01890.)

3.   The relevant portions of the Policy are as
follows:

SECTION II - DEFINITIONS

For the purposes of this policy:

"Disability" and "disabled" mean that because of
injury or sickness:

1.   the insured cannot perform each of the material
duties of his regular occupation; and

2.   after benefits have been paid for 24 months, the
insured cannot perform each of the material
duties of any gainful occupation for which he is
reasonably fitted by training, education or
experience.

* * *

"Partial disability" and "partially disabled" mean

---

[1]   The following facts are undisputed.  They are all derived
from the administrative record (hereinafter "UACL").  (UACL 00013 -
02439, UAPO 001 - 025.)

2

that because of injury or sickness the insured, while unable to perform all the material duties of his regular occupation on a full-time basis, is:

1.    performing at least one of the material duties of his regular occupation or another occupation on a part-time or full-time basis; and

2.    earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness.

* * *

SECTION IV - BENEFITS

DISABILITY

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period.  The benefit will be paid for the period of disability if the insured gives the Company proof of continued:

1.    disability; and
2.    regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

* * *

PARTIAL DISABILITY

When proof is received that an insured is partially disabled within 31 days of the end of a period during which he received disability benefits the Company will pay a monthly benefit.  The partial disability must result from the injury or sickness that caused the disability.

* * *

MONTHLY BENEFIT

* * *

Proof of the insured's monthly earnings must be given to the Company on a quarterly basis.  Benefit payments will be adjusted upon receipt of this proof of earnings.

* * *

3

SECTION VI - GENERAL POLICY PROVISIONS

F.   NOTICE AND PROOF OF CLAIM

* * *

2.   Proof
     a.   Proof of claim must be given to the
          Company.  This must be done no later
          than 90 days after the end of the
          elimination period.

* * *

     c.   Proof of continued disability and
          regular attendance of a physician must
          be given to the Company within 30 days
          of the request for the proof.

* * *

G.   EXAMINATION

     The Company, at its own expense, will have the
     right and opportunity to have an employee, whose
     injury or sickness is the basis of a claim:

     1.   examined by a physician, other health
          professional, or vocational expert of its
          choice; and/or

     2.   interviewed by an authorized Company
          representative.

(UACL 01866 - 01890.)

     4.   On July 6, 1989, plaintiff was injured when he
fell down a set of stairs at work.  (UACL 02312.)

     5.   As a result of spinal and other injuries
sustained in the fall, plaintiff ceased working on September 13,
1989.  (UACL 00429.)

     6.   Plaintiff was certified as disabled by a board
certified neurosurgeon, Dr. Stanton Schiffer, M.D., on September
14, 1989, and again on October 30, 1989, as a result of lumbar

4

cervical radiculopathy, lumbar disc protrusion, and cervical disc protrusion.  (UACL 02249.)

7.   On November 22, 1989, plaintiff filed a claim, with an attached Attending Physician Statement ("APS") by Dr. Schiffer, for disability benefits with UNUM.  (UACL 00429, 02311.)

8.   Plaintiff's claim was granted, and on December 13, 1989, plaintiff began receiving disability benefits supported by the necessary certifications, APSs, and other documents submitted to UNUM.  (Id.)

9.   Over the course of the next five or six years, plaintiff underwent four surgeries related to his injuries, including:

    a.   lumbar percutaenous discectomy at L4-5 in December, 1989;

    b.   left shoulder impingement operation in October, 1990;

    c.   bilateral laminectomy and bilateral disc excision and lumbar laminectomy at L4-5 and L5-S1 in March, 1991; and

    d.   anterior cervical discectomy and interbody fusion at C6-7 in October, 1995.

(UACL 00699.)

10.   On December 12, 1992, plaintiff's treating neurosurgeon, Dr. Schiffer, provided a detailed medical history and evaluation of plaintiff's disability status, in which he indicated that "[i]t has now been three and a half years since Mr. Kniespeck's original date of injury.  I feel that he has

1  reached a level of permanent disability where there will be

2  minimal changes in improvement . . . Chances of future

3  employment for Mr. Kniespeck are practically nil.  With his

4  history of neck pain which continues to persist and his prior

5  surgeries of the left shoulder and the lumbar spine, there are

6  few employers who would be interested in assuming the liability

7  of hiring such an individual.  (UACL 01850 - 01851.)

8         11.  On June 1, 1993, as part of a supplemental claim

9  statement (UACL 01834), plaintiff's primary care physician, Dr.

10  Rajiv Pathak, M.D., submitted an APS, which indicated ongoing

11  neck, arm, and lower-back pain, as well as weakness in

12  plaintiff's left shoulder and both legs.  (UACL 01835.)  Dr.

13  Pathak also indicated that plaintiff had a "fair" prognosis for

14  recovery, but that significant changes, if any, would not occur

15  within six months.  (Id.)

16         12.  In a subsequent September 2, 1993, letter, Dr.

17  Pathak noted that plaintiff was experiencing pain in his neck,

18  lower back, and left shoulder and a limited range of motion in

19  his shoulder.  As a result, he "can sit for a total of six hours

20  but not more than 30 minutes at a time.  I would recommend at

21  least 10-15 minutes rest thereafter.  He can walk for a total of

22  four hours with rest.  He can lift up to 20 pounds on occasion,

23  and can occasionally bend, stoop, squat, kneel and climb steps."

24  (UACL 01812-01813.)  Dr. Pathak refused, however, to opine as to

25  patient's ability to perform the duties of several occupations,

26  including "assistant buyer, production planner, and purchasing

27  agent," as complete job descriptions thereof had not been

28  provided to him.  (Id.)

6

13.  On January 6, 1994, plaintiff was discharged from Fit to Work, a work hardening program, which indicated in its discharge summary that plaintiff's physical limitations rendered him incapable of meeting the job requirements of a Master Scheduler/Planner.  (UACL 01671.)

14.  On January 27, 1994, Dr. Pathak diagnosed plaintiff with: 1) cervical strain; 2) trapezius myositis; 3) left shoulder strain; 4) muscle contraction headache; and 5) mild bilateral carpal tunnel syndrome.  Dr. Pathak further stated that he did not foresee any significant improvement in the near future.  (UACL 01672.)

15.  On August 10, 1994, plaintiff submitted a supplemental claim statement, with an APS by Dr. Pathak echoing his previous determination.  (UACL 01669.)[2]

16.  On June 22, 1995, neurosurgeon Dr. Franklin Wagner, M.D., prepared a "physical capacities evaluation form" for UNUM regarding plaintiff, which noted various limitations in sitting, standing and lifting, and concluded that plaintiff was disabled and incapable of performing even part-time work.  (UACL 01581-01582.)

17.  On October 25, 1995, Dr. Wagner performed a neck surgery (a C6-7 anterior cervical discectomy and interbody fusion) on plaintiff.  (UACL 01560.)  Dr. Wagner indicated to UNUM that the "surgery was successful and the prognosis is good for the patient to return to full time employment.  The normal recovery period for this type of surgery is two months."  (Id.)

---

[2]    Plaintiff erroneously attributes this APS statement to a non-existent "Dr. Kujir."  (Pl.'s Trial Brief 21.)

7

18.   On April 26, 1996, Dr. Wagner provided a certificate of disability to UNUM, indicating that plaintiff was completely disabled, but that recovery was expected around approximately September 1, 1996.  (UACL 01552.)

19.   On May 24, 1996, the Social Security Administration issued a decision regarding plaintiff's appeal of the denial of his claim for disability benefits under the Social Security Act.  (UACL 01526-01537.)  The Administrative Law Judge concluded that plaintiff became disabled as a result of his July 6, 1989, injury, but that his disability ceased as of December 21, 1995.  (UACL 01537.)

20.   The judge commented that the "medical evidence establishes that the claimant has experienced significant improvement in his left shoulder and neck symptomology following" the October 25, 1995, surgery.  (UACL 01536.) Although plaintiff continued to experience lower back pain and discomfort, the judge determined that plaintiff had the "capacity to perform a full range of sedentary work."  (Id.)

21.   On February 25, 1997, Pride Industries, a vocational rehabilitation program, reported on a four-day vocational evaluation, and concluded that plaintiff was likely not "feasible for full time employment."  (UACL 01391.)  The report did indicate, however, plaintiff's "desire to work" and his "willingness to work in a flexible schedule" that might enable him to work part time.

22.   On May 1, 1997, plaintiff notified UNUM that he was claiming "partial disability," based on the fact that he had

8

begun working part-time for his self-run company Comp-U-Mart. (UACL 01080.)

    23.  On September 10, 1998, defendant UNUM closed plaintiff's file, and terminated his claim for disability benefits.  (UACL 00944, 01143.)

    24.  UNUM's denial was based on plaintiff's "failure to provide proof of an ongoing impairment," citing the portion of the Policy under "DISABILITY" which required that he "be under the regular care of a physician" and that he "provide proof of a continuing disability."  (UACL 01143.)

    25.  On January 4, 2000, plaintiff submitted a supplemental claim statement, along with a doctor's certificate by a chiropractor, Dr. Marvin Abbott, M.D., stating that plaintiff was permanently disabled, and without possibility for recovery.  (UACL 00886-00887.)

    26.  Plaintiff appealed UNUM's denial of his claim for disability benefits, which was subsequently denied on May 18, 2000.  (UACL 00959.)

    27.  Thereafter, plaintiff filed this action under ERISA, 29 U.S.C. § 1132(a)(1)(B), for breach of the Policy, seeking to recover disability benefits.  (Compl.)

    28.  This court bifurcated the trial: the first phase was limited to the issue of the correctness of UNUM's decision to terminate plaintiff's benefits for failure to prove continued disability and regular attendance of a physician, while the second phase was reserved for determining benefits, if any, due plaintiff.  (March 19, 2002 Pretrial Order.)

29.  On May 29, 2002, this court ruled in the first phase of trial that defendant's denial of plaintiff's disability claim was improper.  (May 29, 2002 Order.)  Specifically, the court determined that after May 1, 1997, plaintiff's claim should have been processed as one for "partial disability" not "total disability," and that under the Policy a claim for partial disability does <u>not</u> require plaintiff to submit proof of continued disability and regular attendance of a physician.  (<u>Id.</u>)  The court remanded the matter back to defendant for reconsideration consistent with its findings.  (<u>Id.</u>)

30.  Pursuant to this court's order, defendant commenced a reconsideration of plaintiff's claim for partial disability by requesting information related to his work activities.  (UACL 00897.)

31.  In response, plaintiff provided tax returns for 1997, 1998, and 1999, which indicated gross revenues of $4,250, $11,851, and $14,451, respectively.  (UACL 00836 - 00837.)

32.  Plaintiff further informed defendant that a reasonable estimate of his monthly earnings in 2000 - 2001 was approximately $100 per month, but that the loss of his computer prevented him from providing documentation to that effect.[3] (UACL 00838 - 00840).

33.  On November 2, 2002, Vicki Riggs, UNUM's internal CPA, did a calculation based on the income information provided by plaintiff, and concluded that because plaintiff sustained an overall earnings loss, he would be entitled to full monthly

---

[3]    Plaintiff did not file tax returns for these two years, because his income was below the minimum amount required to file.

1  benefits of $1,717.20 per month after May 1, 1997.  (UACL 00837,
2  001625.)

3       34.  In a subsequent letter, plaintiff provided
4  defendant with a receipt book for 2002 and 2003, evidencing 18
5  sales transactions between June, 2002, and September, 2003, each
6  averaging approximately $10 - $15.  (UACL 00737 - 00755.)

7       35.  On January 19, 2004, Dr. Frank Kanovsky conducted
8  a brief overview of the case and concluded that there was
9  insufficient evidence to make a determination as to work
10  capacity.  He recommended that plaintiff undergo an independent
11  medical examination ("IME") as well as a functional capacity
12  evaluation ("FCE").  (UACL 00691.)

13       36.  Because of difficulties scheduling an IME, on
14  April 8, 2004, Dr. Kanovsky performed a comprehensive review of
15  plaintiff's medical file.  Dr. Kanovsky noted plaintiff's
16  significant complaints of pain, but observed that plaintiff did
17  not take any regular pain medication, and that his symptoms
18  indicated a "non-anatomical distribution."  Dr. Kanovsky again
19  indicated his opinion that an IME as well as other diagnostic
20  studies would aid in a more complete analysis.  (UACL 00700.)

21       37.  On July 13, 2004, an IME and medical record
22  review was conducted by Dr. Ronald Wolfson, M.D., a board
23  certified orthopedic surgeon.  (UACL 00525.)

24       38.  Dr. Wolfson's August 11, 2004, report indicated
25  that plaintiff presented significant subjective complaints, but
26  that the "objective factors of disability are more difficult to
27  determine."  (UACL 00536.)  While he noted that there were no
28  clear-cut signs of exaggeration, "clearly the subjective

11

1  complaints are much worse than they were ever noted even before

2  surgery." (Id.)  Dr. Wolfson suggested that additional x-ray

3  and MRI diagnostic tests be performed.  (Id.)

4        39.  On September 24, 2004, plaintiff underwent

5  multiple x-ray and MRI tests, which showed mild impingment of

6  the left shoulder (UACL 00489), narrowing of the C5-C6 disk

7  space (UACL 00491), mild disc bulge at C5-C6 (UACL 00485),

8  fusion of C6 and C7 (Id.), a small amount of spurring

9  posterolaterally to the left side of C4-C5 with slight

10 encroachment upon the left neural foramen (UACL 00487),

11 spondylolisthesis of L4 upon L5 and slight posterior

12 sublixuation of L5 upon S1 (Id.), and soft tissue intrusion into

13 the anterior epidural space to the left of midline of L4-L5.

14 (Id.)

15        40.  Dr. Wolfson reviewed these diagnostic studies,

16 and issued a supplemental report, in which he concluded that

17 "Mr. Kniespeck's subjective complaints are way out of proportion

18 to his objective findings on the diagnostic studies.  It is my

19 belief, after reviewing the studies that this man is able to

20 work full-time in the computer repair business . . . ."  (UACL

21 00494.)

22        41.  On January 21, 2005, Dr. Kanovsky reviewed Dr.

23 Wolfson's reports, as well as the x-ray and MRI films.  (UACL

24 00479.)  He noted that for someone with his symptoms,

25 plaintiff's lack of the need for pain medication, as well as his

26 decision to limit his treatment to occasional chiropractic

27 visits, undermined the credibility of his subjective complaints.

28 (Id.)  Dr. Kanovsky indicated his agreement with Dr. Wolfson's

1 conclusions that plaintiff was capable of working eight hours a
2 day, five days a week.  (UACL 00471.)

3       42.  On February 9, 2005, Dr. Lee Snook M.D.,
4 conducted a full independent medical examination, in which he
5 reviewed the file and complete medical record and conducted a
6 physical evaluation of plaintiff.  (UACL 00463 - 00468.)  Dr.
7 Snook concluded that plaintiff "is permanently disabled and is
8 unable to return to the work force in a full-time capacity."
9 (UACL 00467.)

10       43. On March 15, 2005, Dr. Wolfson reviewed Dr.
11 Snook's report, and disagreed with his conclusions.  (UACL
12 00092.)  Dr. Wolfson stated that "Dr. Snook has given an opinion
13 based on Mr. Kniespeck's subjective complaints of pain and may
14 have overlooked the objective findings in the case."  (Id.)

15       44.  On May 11, 2005, UNUM issued its decision to deny
16 further benefits to plaintiff based on the reports of Drs.
17 Kanovsky and Wolfson, concluding that plaintiff was neither
18 partially nor totally disabled because he was capable of working
19 on a full-time basis in a sedentary to light occupation.  (UACL
20 00429-00443.)  UNUM also concluded that plaintiff did not
21 qualify as "partially disabled" because he failed to
22 sufficiently prove that he was in fact working part-time.  (Id.)

23       45.  Plaintiff appealed UNUM's denial, largely by
24 providing an FCE performed by a physical therapist, Larry Gray,
25 two years prior.[4]  (UACL 00261 - 00268.)

26

27       [4]    Plaintiff contends that Mr. Gray's report was issued on
28 November 2, 2005, however, the document itself shows a date of
   November 2, 2003.

46.  Mr. Gray's report indicated that plaintiff likely: 1) could sit for no more than 30 minutes at a time without a 10 minute rest period; 2) could stand in one position for no more than 15 minutes without being allowed to change position; 3) could not reach above 56 inches with his left arm; 4) could not lift certain heavy loads; and 5) could not perform tasks below knee level.  (UACL 00267.)  Based on these limitations, Mr. Gray concluded that plaintiff "would likely only tolerate part-time work."  (Id.)

47.  On December 21, 2005, Dr. Wolfson issued a supplemental report reviewing Mr. Gray's FCE report, in which he disagreed with Mr. Gray's conclusions.  (UACL 00237 - 00239.) In relevant part, Dr. Wolfson opined that the FCE was not objective, and expressed nothing more than Mr. Gray's opinion based on plaintiff's subjective reporting.  (Id.)

48.  On December 28, 2005, Dr. Snook reviewed Dr. Wolfson's supplemental report, and expressed his disagreement with Dr. Wolfson's critiques of the FCE procedure.  (UACL 00208 - 00210.)  Dr. Snook stated "[t]here is multiple evidence on the MRI and x-rays of spondylosis with degenerative disk disease, degenerative joint disease, and previous surgeries.  These alone in a chronic pain practice are strongly correlated with chronic pain presentations and attendant limitations."  (UACL 00210.) Dr. Snook also noted that pain "is in large part a subjective perception," and thus is not something which can easily be objectified or quantified.  (Id.)

49.  On January 6, 2006, Dr. Charles Sternberg, a board certified neurosurgeon, performed a review of plaintiff's

14

medical history and claim file, and determined that plaintiff

was capable of sustaining "sedentary/light work with

accommodation to prevent overhead reaching with the left upper

extremity, minimize repetitive flexion-extension movements of

the neck, and allow changes in position as necessary for

comfort." (UACL 00219.) Dr. Sternberg also indicated his

opinion that the FCE report performed by Mr. Gray "did not

provide standardized measures of validity testing in any way."

(Id.)

50. On February 27, 2006, Mr. Gray responded to Dr.

Wolfson's critiques of the FCE, by noting that he employs a

"kinesio-psychological" method, which means that a trained

professional "is in total control of the tests and results at

all time" and that "subjective reports are taken into

consideration, but if they are not associated with objective

findings and observations they then have no value." (UACL

00083.)

51. On March 14, 2006, Dr. Sternberg responded to Mr.

Gray's letter of February 27, 2006, and noted that Mr. Gray's

style of FCE depends on the client's "self reporting of ability

combined with the evaluator's observation of performance. Mr.

Gray's system does not document objective physiological

parameters . . . nor does it provide documentation of the

claimant's consistency of effort." (UACL 00037 - 00038.) He

further states that much of the report lacks "medical

credibility," and fails to give a "credible objective evaluation

of the claimant's functional capacity." (Id.)

1    52.  At some point in March, 2006, Richard Byard, a

2 vocational rehabilitation consultant, conducted a review of

3 plaintiff's restrictions and limitations, as well as his work

4 history, and concluded that plaintiff would be a viable

5 candidate for several occupations for which he had adequate

6 training and experience.  (UACL 00087 - 00088.)

7    53.  On April 5, 2006, UNUM denied plaintiff's appeal

8 of his adverse claim determination, based again on their belief

9 that: 1) he was capable of performing sedentary to light work

10 full-time; and 2) that his activities selling computer parts did

11 not constitute part-time work.

12                        CONCLUSIONS OF LAW

13    1.  ERISA provides for judicial review of a decision

14 to deny benefits to an ERISA plan beneficiary.  See 29 U.S.C. §

15 1132(a)(1)(B).

16    2.  ERISA creates federal court jurisdiction to hear

17 such a claim.  See 29 U.S.C. § 1132(e).

18    3.  ERISA benefits determinations are to be reviewed

19 de novo, "unless the benefit plan gives the administrator or

20 fiduciary discretionary authority to determine eligibility for

21 benefits or to construe the terms of the plan."  Firestone v.

22 Burch, 489 U.S. 101, 115 (1989).  An administrator has

23 discretion only where it is "unambiguously retained."  Kearney,

24 175 F.3d at 1090 (quoting Bogue v. Ampex Corp., 976 F.2d 1319,

25 1325 (9th Cir. 1992)).  As per this court's previous order, both

26 parties agree that the Policy contains no such language, and

27 thus UNUM's denial is to be reviewed de novo.  (May 29, 2002

28 Order.)

1        4.   In a de novo review, determining whether
2    plaintiff is entitled to disability benefits requires the court
3    to interpret the plan by looking "first to the terms of the plan
4    itself." Nelson v. EG & G Energy Measurements Group, Inc., 37
5    F.3d 1384, 1389 (9th Cir. 1994).

6        5.   "When faced with questions of insurance policy
7    interpretation under ERISA, federal courts should apply federal
8    common law." Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125
9    (9th Cir. 2002) (citing Firestone, 489 U.S. at 110).

10       6.   Under federal law, courts should then interpret
11   plan terms "in an ordinary and popular sense as would a [person]
12   of average intelligence and experience." Allstate Ins. Co. v.
13   Ellison, 757 F.2d 1042, 1044 (9th Cir. 1985).

14       7.   As this court determined in trial phase one,
15   plaintiff's claim should have been considered as one for
16   "partial disability" benefits after May 1, 1997. (May 29, 2002
17   Order.)  Because defendants did not terminate plaintiff's
18   benefits until after that date (September 10, 1998), the
19   relevant analysis is whether plaintiff was, and continues to be,
20   entitled to partial disability benefits at the time of their
21   termination.

22       8.   Unlike "total disability," a claim for "partial
23   disability" does not require that plaintiff submit proof of
24   continued disability or regular attendance of a physician.  (May
25   29, 2002 Order.)

26       9.   Nonetheless, a claimant receiving partial
27   disability benefits is still subject to the requirement that he
28   be "unable to perform all the material duties of his regular

17

1  occupation on a full-time basis" due to "sickness or illness."

2  (UACL 01874.)  It is for this reason the Policy provides that,

3  at its own expense, UNUM has the "right and opportunity to have

4  an employee, whose injury or sickness is the basis of a claim  .

5  . . examined by a physician."  (UACL 01886.)

6       10.  After review of the administrative record,

7  including all of plaintiff's relevant medical history, the court

8  concludes that plaintiff was and remains unable to perform all

9  the material duties of his regular occupation on a full-time

10 basis.

11      11.  The evidence seems clear (and defendant does not

12 appear to dispute) that prior to plaintiff's October 25, 1995,

13 surgery, plaintiff was "totally disabled."  This conclusion is

14 well supported by numerous reports and disability certifications

15 by Drs. Schiffer, Pathak, Abbot, and Wagner, as well as the Fit

16 To Work discharge report and the findings of the Social Security

17 Administration.[5]

18      12.  After May 17, 1997, however, plaintiff stopped

19 submitting regular proof of disability, and apparently the only

20 regular medical care he sought was an occasional chiropractic

21 visit to Dr. Abbott.

22      13.  With regard to plaintiff's physical capabilities,

23 this court finds plaintiff's complaints of pain, and

24 corresponding functional limitations, to be credible, and

25

26     [5]   See Riedl v. General Am. Life Ins. Co., 248 F.3d 753, 759
27 n.4 (8th Cir. 2001) ("Although the Social Security Administration's
   determination is not binding, it is admissible evidence to support
28 an ERISA claim for long-term disability benefits [on de novo
   review].")

1  sufficiently supported both by the medical evidence as well as

2  the evidence of plaintiff's functional capacity.

3       14.  "On de novo review, a district court may, in

4  conducting its independent evaluation of the evidence in the

5  administrative record, take cognizance of the fact (if it is a

6  fact in the particular case) that a given treating physician has

7  a 'greater opportunity to know and observe the patient' than a

8  physician retained by the plan administrator."  Jabian v.

9  Hewlett-Packerd Co., 349 F.3d 1098, 1105 (9th Cir. 2003)

10 (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822,

11 834 (2003)).

12      15.  Counseling against a finding of disability

13 (either partial or total) are reports by Drs. Kanovsky, Wolfson,

14 and Sternberg, all of which conclude that plaintiff is capable

15 of returning to full time work.  Notably, of the three, only Dr.

16 Wolfson examined plaintiff in person, while Drs. Kanovsky and

17 Sternberg's reviews were limited to consideration of plaintiff's

18 claim file and medical history.

19      16.  As defendant points out, these doctors' reports

20 emphasize the lack of probative objective measures of

21 plaintiff's disability, focusing on the diagnostic MRIs and x-

22 rays taken in 2004.  (Def.'s Trial Br. 21-22.)  However,

23 plaintiff has continued to exhibit physical manifestations of

24 his injuries.

25      17.  Specifically, in 2004, plaintiff's x-rays and

26 MRIs indicated mild impingement of the left shoulder (UACL

27 00489), narrowing of the C5-C6 disk space (UACL 00491), mild

28 disc bulge at C5-C6 (UACL 00485), fusion of C6 and C7 (Id.), a

19

1  small amount of spurring posterolaterally to the left side of
2  C4-C5 with slight encroachment upon the left neural foramen
3  (UACL 00487), spondylolisthesis of L4 upon L5 and slight
4  posterior subluxation of L5 upon S1 (Id.), and soft tissue
5  intrusion into the anterior epidural space to the left of
6  midline of L4-L5. (Id.)

7          18.  While defendant, as well as Drs. Kanovsky,
8  Wolfson, and Sternberg, thus all admit that plaintiff does have
9  some objective indicators of physiological neck, back, and
10  shoulder problems (Id. at 8), they contend that these objective
11  measures do not comport with plaintiff's subjective pain
12  complaints.

13          19.  However, a claimant need not present clinical or
14  diagnostic evidence to support the severity of his pain.
15  Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990)
16  (observing that "it is the very nature of excess pain to be out
17  of proportion to the medical evidence").

18          20.  In support of his claim for disability, plaintiff
19  presents the certifications and/or reports of three individuals,
20  all of whom personally evaluated and treated plaintiff.  First,
21  plaintiff submitted the certification by Dr. Abbott, his regular
22  treating chiropractor, which concluded that plaintiff was
23  permanently disabled.  Second is the report of Dr. Snook, who
24  conducted a complete medical history review and IME in 2005, and
25  concluded that plaintiff was permanently disabled.  Finally,
26  plaintiff submitted a report by Mr. Gray, prepared after a
27  functional capacity evaluation, which indicated plaintiff's
28

1  specific limitations and the conclusion that he could likely
2  only tolerate part-time work.

3          21.  In addition to the physician reports above,
4  plaintiff also presented the findings of a vocational
5  rehabilitation program, Pride Industries, which focused
6  specifically on what tasks and/or jobs plaintiff would be
7  capable of performing given his physical limitations.  As with
8  the three individuals above who examined plaintiff in person,
9  the report concluded that plaintiff was not capable of full time
10 employment.

11         22.  A finding that the claimant lacks credibility
12 cannot be premised wholly on a lack of medical support for the
13 severity of his pain.  Lester v. Chater, 81 F.3d 821, 834 (9th
14 Cir. 1995) ("Once the claimant produces medical evidence of an
15 underlying impairment, the Commissioner may not discredit the
16 claimant's testimony as to subjective symptoms merely because
17 they are unsupported by objective evidence").

18         23.  While some of the evidence supporting plaintiff's
19 claim for disability is admittedly more subjective, it is the
20 very nature of pain that it cannot be easily measured or proven.
21 Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess
22 pain' is, by definition, pain that is unsupported by objective
23 medical findings.")

24         24.  In this respect, plaintiff presents the more
25 credible and probative evidence, which focuses specifically on
26 showing not what objective indicators exist, but what the
27 effects of those objective indicators are.  In particular,
28 plaintiff's FCE by Mr. Gray as well as the report by Pride

21

1  Industries go directly to demonstrating what plaintiff would be
2  capable of in a work environment.

3          25.  This court thus finds that, under the meaning of
4  the Policy, "because of injury or sickness" plaintiff is "unable
5  to perform all the material duties of his regular occupation on
6  a full-time basis."

7          26.  In addition to this requirement, for "partial
8  disability" the Policy requires that plaintiff be: 1) performing
9  at least one of the material duties of his regular occupation or
10 another occupation on a part-time or full-time basis; and 2)
11 earning currently at least 20% less per month than his indexed
12 pre-disability earnings due to that same injury or sickness."
13 (UACL 01874.)

14         27.  Defendant contends that plaintiff's sales of
15 spare computer parts after 1999 do not constitute part-time
16 work, but are instead merely "a hobby or past-time," and that
17 plaintiff has failed to provide sufficient "proof" of his
18 monthly earnings so as to support a claim for partial
19 disability.  (Def.'s Trial Br. 20.)

20         28.  For the years 1997 through 1999, plaintiff
21 submitted tax returns evidencing gross revenues of $4,250,
22 $11,851, and $14,451.  After 1999, however, plaintiff's part-
23 time activities suffered a noticeable decline in profitability,
24 during which asserts he averaged roughly $100 per month in
25 income over the next two years.  In 2002 and 2003, as evidenced
26 by the receipts in the administrative record, plaintiff's
27 business activities were limited one or two sales a month of
28 various scrapped computer parts, costing between $10 and $20.

1          29.  Reading the language of the Policy in its

2  "ordinary and popular sense,"  Allstate, 757 F.2d at 1044, this

3  court finds these activities to constitute "part-time" work.

4  Undoubtedly, plaintiff's business transactions are minimal, but

5  they are nonetheless activities, of the exact same sort that he

6  carried out with more frequency in years prior, that utilize

7  plaintiff's particular area of expertise in order to produce

8  income.

9          30.  Plaintiff's efforts at returning to some sort of

10  work in spite of his injury cannot act to preclude his claim for

11  partial disability--indeed, this would run counter to the entire

12  purpose of the Policy.  The success of plaintiff's claim for

13  disability benefits cannot be made to turn on the relative

14  financial success or failure of his part-time venture.

15          31.  Defendant is of course correct that the Policy

16  requires plaintiff to submit proof of monthly earnings.[6]

17  However, the purpose of this requirement is simply to allow UNUM

18  to properly adjust any benefits, given plaintiff's supplemental

19  income.

20          32.  While plaintiff's evidence of part-time work for

21  2000 through 2003 is indeed sparse, and does indicate that his

22  part-time work did not yield a substantial amount of income, it

23

24

25

26

27          [6]     "Proof of the insured's monthly earnings must be given
28  to the Company on a quarterly basis.  Benefit payments will be
    adjusted upon receipt of this proof of earnings."  (UACL 01877.)

23

1  is nonetheless sufficient to allow UNUM to appropriately adjust
2  plaintiff's disability benefits.[7]

3       33.  Defendant contends that, as a result of this
4  court's previous order, plaintiff can now circumvent the
5  requirements of continuing proof of disability and regular care
6  of a physician under "total disability," by simply bringing a
7  claim for partial disability.  (Def.'s Trial Br. 20.)

8       34.  As this court noted in that prior order, however,
9  such lowered requirements "make[] sense in the overall scheme of
10  the policy.  An insured who is 'disabled,' as defined by the
11  policy, would not be working and therefore more likely to be
12  under the care of a doctor than someone who is 'partially
13  disabled.'"  (May 29, 2002 Order.)

14       35.  These are the terms of the Policy, interpreted in
15  their "ordinary and popular sense," Allstate, 757 F.2d at 1044,
16  and it would not be proper for this court to establish an
17  arbitrary cut-off point at which "part-time" work ceases to be
18  "part-time" work but instead a hobby or past-time.

19       36.  If at some point it becomes clear that plaintiff
20  is not engaged in any part-time work, then of course UNUM has a
21  right to demand proof of continuing disability and regular care
22  of a physician.

23       37.  However, for the reasons stated above, this court
24  finds that defendant's denial of plaintiff's claim for partial
25  disability benefits was improper.

26

27       [7]   Neither party disputes that plaintiff's part-time income
28  falls well below the Policy requirement of being no more than 80%
   of his indexed pre-disability income.

24

1        38.  Plaintiff's monthly disability benefits are
2   $1,717.20 per month, and the period between September 1998 and
3   December 2006 constitutes 100 months unpaid.
4   _____IT IS THEREFORE ORDERED THAT plaintiff's claim for
5   partial disability benefits be, and the same hereby is, GRANTED,
6   in the sum of $171,200.00.
7        IT IS FURTHER ORDERED THAT plaintiff is entitled to
8   benefits going forward, conditioned on the requirements of the
9   Policy as interpreted by this order.
10       LET JUDGMENT BE ENTERED ACCORDINGLY.
11  DATED: December 19, 2006

13  WILLIAM B. SHUBB
14  UNITED STATES DISTRICT JUDGE